# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

VIRGINIA AZAR and CHYVONNE
WILLIAMS, individually and on behalf of all
others similarly situated,

        Plaintiff,

vs.

NISSAN NORTH AMERICA, INC.,

        Defendant.

No.

Hon.

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

## <u>CLASS ACTION COMPLAINT</u>

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................. 1

II.    JURISDICTION AND VENUE ......................................................................... 6

III.   PARTIES ............................................................................................................ 7

       A.     Plaintiffs ................................................................................................. 7

              1.     Virginia Azar (Florida) ............................................................... 7

              2.     Chyvonne Williams (Michigan) ................................................. 8

       B.     Defendant ............................................................................................... 8

IV.    FACTUAL ALLEGATIONS ............................................................................. 9

       A.     Nissan marketed the Nissan Leaf as a safe electric vehicle with
              quick charging capabilities. .................................................................. 9

       B.     The Spontaneous Fire Risk. ................................................................ 13

       C.     Nissan knew or should have known of the Spontaneous Fire Risk
              long before it disclosed the problem to Plaintiffs and Class
              Members. .............................................................................................. 16

              1.     Brief overview of lithium-ion batteries ................................... 16

              2.     Notwithstanding the great body of knowledge about the
                     risks of spontaneous combustion in lithium-ion batteries,
                     Nissan launched the Class Vehicles without either
                     protecting against that risk or advising consumers of that
                     risk .......................................................................................... 18

              3.     Nissan launches the Class Vehicles, and fires result. ............. 23

       D.     The Recalls have failed to provide a remedy and restrict the normal
              and expected use of the Class Vehicles. ............................................. 26

V.     TOLLING OF THE STATUTE OF LIMITATIONS ........................................ 32

       A.     Discovery Rule Tolling ........................................................................ 32

       B.     Fraudulent Concealment Tolling ......................................................... 33

       C.     Estoppel ............................................................................................... 33

VI.    CLASS ALLEGATIONS ........................................................................... 34

VII.    CLAIMS ................................................................................................. 37

    A.    Nationwide Claims.......................................................................... 37

COUNT I VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT (15
U.S.C. § 2301, *et seq.*) (Alleged by all Plaintiffs on behalf of the
Nationwide Class or, in the alternative, the State Subclasses) ....................... 37

    B.    State-Specific Claims....................................................................... 40

        1.    Florida ................................................................................ 40

COUNT II VIOLATIONS OF THE FLORIDA UNFAIR & DECEPTIVE
TRADE PRACTICES ACT (Fla. Stat. § 501.201, *et seq.*) (Alleged by
Plaintiff Azar on behalf of the Florida Subclass)............................................ 40

COUNT III BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
UNDER FLORIDA LAW (Fla. Stat. § 672.314)  (Alleged by Plaintiff
Azar on behalf of the Florida Subclass)........................................................... 43

COUNT IV BREACH OF EXPRESS WARRANTY UNDER FLORIDA LAW
(Fla. Stat. § 672.313, 680.21 and 680.1031)  (Alleged by Plaintiff Azar on
behalf of the Florida Subclass) ........................................................................ 45

COUNT V UNJUST ENRICHMENT (COMMON LAW) (Alleged by Plaintiff
Azar on behalf of the Florida Subclass)........................................................... 48

        2.    Michigan ............................................................................ 49

COUNT VI VIOLATIONS OF THE MICHIGAN CONSUMER PROTECTION
ACT (Mich. Comp. Laws § 445.903, *et seq.*) (Alleged by Plaintiff
Williams on behalf of the Michigan Subclass)................................................. 49

COUNT VII BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
UNDER MICHIGAN LAW (Mich. Comp. Laws § 440.2314)  (Alleged by
Plaintiff Williams on behalf of the Michigan Subclass)................................... 52

COUNT VIII BREACH OF EXPRESS WARRANTY UNDER MICHIGAN
LAW (Mich. Comp. Laws §§ 440.2313 and 440.2860)  (Alleged by
Plaintiff Williams on behalf of the Michigan Subclass)................................... 53

COUNT IX UNJUST ENRICHMENT (COMMON LAW) (Alleged by Plaintiff
Williams on behalf of the Michigan Subclass) ................................................ 56

REQUEST FOR RELIEF ........................................................................................ 57

DEMAND FOR JURY TRIAL ............................................................................... 58

Plaintiffs file this lawsuit individually and on behalf of proposed nationwide and statewide classes. Plaintiffs allege the following based on personal knowledge as to their own acts and experiences and, as to all other matters, based on the investigation of counsel:

## I.      INTRODUCTION

1.      The most important duty of a car manufacturer is to sell only safe vehicles. A second related duty is to promptly warn consumers and fix or replace a car when the manufacturer learns of a defect that implicates serious safety issues. Finally, a car manufacturer's vehicles must be fit for their ordinary use.

2.      Defendant Nissan North America, Inc. ("Nissan" or "Defendant") breached these fundamental duties by manufacturing, marketing, and selling defective 2019-2022 Nissan Leaf electric vehicles equipped with a "quick charge" port (the "Class Vehicles")[1] that were dangerous and prone to catching fire while charging with a Level 3 charger, the fastest battery charging functionality available on these vehicles. Even though Nissan knew of the fire risk prior to launching the vehicles, it did nothing to warn owners and lessees prior to sale/lease.

3.      The Class Vehicles are powered by a high-voltage lithium-ion battery supplied by Automotive Energy Supply Corporation, and were designed with a specialized "quick charge" port to enable fast charging through a Level 3 charger. There is a defect, however, in the Class Vehicles' high-voltage battery system that can cause the vehicles to overheat and catch fire during Level 3 fast charging (the "Spontaneous Fire Risk Defect").

4.      The Spontaneous Fire Risk Defect exposes Plaintiffs and Class Members to an unreasonable risk of injury, death, or property damage if their vehicle catches fire, including while

_____

[1] Plaintiffs reserve the right to amend this complaint to add additional model year Nissan Leaf vehicles upon further investigation of the vehicles' batteries and the alleged defect.

the vehicle is parked at the Class Member's home, on a public street, or in a public parking lot. The Spontaneous Fire Risk Defect also exposes passengers, other drivers on the road, neighbors, owners of other cars parked near the Class Vehicles, and other bystanders to an unreasonable risk of injury, death, and/or property damage.

5.     The consequences of the Spontaneous Fire Risk Defect are extremely dangerous, as the following photos illustrate:



*Photo of Nissan Leaf fire while plugged into Level 3 charger, reported by consumer to have occurred August 14, 2024.*[2]

---

[2] Exhibit 1, *Nissan Leaf caught on fire while charging*, MY NISSAN LEAF FORUM, https://mynissanleaf.com/threads/nissan-leaf-caught-on-fire-while-charging.36301/ (last visited Oct. 8, 2025).



*News report of Nissan Leaf fire during charging, which occurred on September 28, 2025 in Littleton, Colorado.*[3]



*Additional report and photos of September 28, 2025 Littleton, Colorado fire.*[4]

---

[3] Exhibit 2, Aspen Andrews, *Firefighters share tips for EV owners after responding to electric vehicle fire in Littleton*, KKTV11 ALERT (Sept. 30, 2025), https://www.kktv.com/2025/09/30/firefighters-share-tips-ev-owners-after-responding-electric-vehicle-fire-littleton/

[4] Exhibit 3, Robert Garrison, *EV fire prompts evacuations at Littleton shopping center*, DENVER 7 ABC (Sept. 28, 2025), https://www.denver7.com/news/local-news/littleton-businesses-evacuated-after-electric-vehicle-fire

6.      Alarmingly, Nissan has apparently identified the root cause of the Spontaneous Fire Risk Defect (and at least ten Class Vehicle fires)[5] to be excessive lithium deposits within battery cells,[6] but has failed to provide a remedy to the Spontaneous Fire Risk Defect.

7.      In September 2024, Nissan announced Recall 24V-700 (referred to internally at Nissan as Recall No. R24B2) ("the "2024 Recall")[7] and instructed owners and lessees of certain 2019-2020 Nissan Leaf vehicles to not to use Level 3 quick charging "until the remedy is completed."[8] Nissan's recall communications to consumers estimated that it would provide a recall remedy by November 2024.[9]

8.      In November 2024, however, Nissan revised its estimated timeline for remedy availability, stating that "[d]ue to an unexpected delay in the final remedy software development, owners will be mailed a second interim letter in late November 2024, updating them on the final remedy schedule. Nissan now expects the final remedy software to be available in Spring 2025."[10]

9.      It has now been over a year since Nissan issued the 2024 Recall, and Nissan still has not provided any remedy, let alone an adequate remedy, for the Spontaneous Fire Risk Defect.

10.      Now, just this month, Nissan has issued another recall, Recall 25V655 (referred to internally at Nissan as Recall No. R25C8) (the "2025 Recall") (collectively with the 2024 Recall,

---

[5] Exhibit 4, Defect Information Report, November 14, 2024, https://static.nhtsa.gov/odi/rcl/2024/RMISC-24V700-4145.pdf.
[6] Exhibit 5, September 19, 2024 Part 573 Safety Recall Report, https://static.nhtsa.gov/odi/rcl/2024/RCLRPT-24V700-1828.PDF.
[7] *Id.*
[8] *Id.*
[9] Exhibit 6, October 3, 2024 NHTSA Letter, https://static.nhtsa.gov/odi/rcl/2024/RCAK-24V700-6101.pdf.
[10] Exhibit 7, November 14, 2024 Part 573 Safety Recall Report, https://static.nhtsa.gov/odi/rcl/2024/RCLRPT-24V700-7150.PDF; Exhibit 8, Nissan Safety Recall Campaign Bulletin (Dec. 4, 2024), https://static.nhtsa.gov/odi/rcl/2024/RCMN-24V700-2544.pdf.

4

the "Recalls"). The 2025 Recall is directed at the same Spontaneous Fire Risk Defect as the 2024 Recall but applies to 2021-2022 Nissan Leaf vehicles.[11] The 2025 Recall similarly instructs owners and lessees not to use Level 3 quick charging "until the remedy is completed," but provides no estimate for rollout of that purported remedy.[12] Nissan has not yet even instructed owners and lessees of the 2021-2022 Nissan Leaf vehicles of the Defect or the 2025 Recall, as owner notification letters are not planned to be mailed out until October 24, 2025.[13]

11.     In total, across the two Recalls, covering four model years of Nissan Leaf vehicles, more than 40,000 vehicles have the Spontaneous Fire Risk Defect and are prone to catching fire.

12.     The safety and reliability of the Class Vehicles and their batteries was material to Plaintiffs' and Class Members' decisions to purchase or lease their Class Vehicles.  Additionally, the availability and utility of the Level 3 quick charging was material to Plaintiffs' and Class Members' decisions to purchase or lease their Class Vehicles. The inability to use Level 3 quick charging significantly affects their use of their vehicles. In fact, the difference between Level 3 charging and Level 2 charging is significant. Nissan's website states that Level 2 charging would charge a battery from 0% to 100% in either 10.5 or 14 hours (depending on battery size). Level 3 charging, however, can charge a battery from 10% to 80% in as little as 35-40 minutes.[14]

13.     Nissan has offered no remedy for the batteries that cause the Spontaneous Fire Risk and no reimbursement to Class Vehicle owners and lessees for out-of-pocket expenses, loss of use, and loss of value.

---

[11] Exhibit 9, October 1, 2025 Part 573 Safety Recall Report, https://static.nhtsa.gov/odi/rcl/2025/RCLRPT-25V655-5278.pdf.
[12] *Id.*
[13] *Id.*
[14] Exhibit 10, *Range & Charging*, NISSAN, https://www.nissanusa.com/vehicles/going-electric-ev/range-charging.html (last visited Oct. 8, 2025).

14.     Because of Nissan's sale and marketing of these defective vehicles and its fraudulent concealment of the Spontaneous Fire Risk Defect, Nissan has violated state consumer protection acts, breached its express warranties to Plaintiffs and Class Members, breached the implied warranties of merchantability codified in state law, and been unjustly enriched. Owners and lessees of Class Vehicles have been injured in fact, incurred damages, and suffered ascertainable losses in money and property.

15.     Had Plaintiffs and Class Members known of the Spontaneous Fire Risk Defect, then they would either not have purchased or leased those vehicles or would have paid substantially less for them. Plaintiffs and Class Members did not receive the benefit of their bargain. Plaintiffs have suffered a classic "pocketbook" injury.

16.     Additionally, Plaintiffs and Class Members have been damaged by being unable to use the Level 3 quick charging functionality a reasonable consumer would expect to be able to use when purchasing or leasing their Class Vehicles. Because the Defect deprives owners of the ability to use Level 3 charger functionality, it renders the vehicles unfit for their ordinary and reasonably expected use, that is, driving Class Vehicles without the limitation of only being able to use certain, less functional chargers. The defect functionally limits the range and usefulness of the vehicles, rendering it unmerchantable and causing economic harm to the owner.

17.     Plaintiffs bring this class action to redress Nissan's misconduct. Plaintiffs seek damages and a repair under the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301-2312, as well as under state consumer protection acts, express and implied warranties, and unjust enrichment.

## II.     JURISDICTION AND VENUE

18.     This Court has original jurisdiction over this lawsuit under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2) and (6), because Plaintiffs and Defendant are citizens of different states; there are more than 100 members of the Class and each Subclass (as defined

herein); the aggregate amount in controversy exceeds $5 million, exclusive of attorneys' fees, interest, and costs; and class members reside across the United States.

19. This Court has personal jurisdiction over Nissan by virtue of its transactions and business conducted in this judicial district, and because Nissan is headquartered in this judicial district. Nissan has transacted and done business, and violated statutory and common law, in the State of Tennessee and in this judicial district.

20. Venue is proper in this judicial district under 28 U.S.C. § 1391 because Nissan transacts substantial business and is headquartered in this district.

### III. PARTIES

**A. Plaintiffs**

**1. Virginia Azar (Florida)**

21. Plaintiff and proposed class representative Virginia Azar ("Plaintiff," for purposes of this paragraph) is a resident and citizen of Davenport, Florida. Plaintiff purchased a used 2020 Nissan Leaf on June 9, 2021, from Carvana, LLC. Plaintiff's Nissan Leaf vehicle is a Class Vehicle which contains the Spontaneous Fire Risk Defect. Through exposure and interaction with Nissan, Plaintiff was aware of Nissan's uniform and pervasive marketing messages of dependability and safety and the benefits of being able to drive the vehicle in electric mode and using the Level 3 quick charging feature; these were primary reasons Plaintiff purchased the vehicle. However, despite touting the safety and dependability of the Class Vehicles and the benefits of using the Level 3 quick charging, at no point did Nissan or any agent or affiliate or disclose to Plaintiff the Spontaneous Fire Risk. Plaintiff is now concerned about driving it and charging it due to the dangers resulting from the Spontaneous Fire Risk Defect. In addition, Plaintiff has complied with Nissan's instructions not to use the Level 3 quick charging since October 2024 and has called Nissan several times since then to see if a remedy was available. As a result of the Defect and the

inability to use Level 3 quick charging, Plaintiff is unable to travel long distances with her vehicle. Plaintiff would not have purchased the vehicle, or would have paid less for it, had Plaintiff known about the Spontaneous Fire Risk or that her ability to use the Level 3 quick charging would be inhibited.

### 2. Chyvonne Williams (Michigan)

22. Plaintiff and proposed class representative Chyvonne Williams ("Plaintiff," for purposes of this paragraph) is a resident and citizen of Detroit, Michigan. Plaintiff purchased a used 2022 Nissan Leaf in April 2025, from Dick Scott Chrysler Dodge Jeep Ram dealership in Plymouth, Michigan. Plaintiff's Nissan Leaf vehicle is a Class Vehicle which contains the Spontaneous Fire Risk Defect. Through exposure and interaction with Nissan, Plaintiff was aware of Nissan's uniform and pervasive marketing messages of dependability and safety and the benefits of being able to drive the vehicle in electric mode and using the Level 3 quick charging feature; these were primary reasons Plaintiff purchased the vehicle. However, despite touting the safety and dependability of the Class Vehicles and the benefits of using the Level 3 quick charging, at no point did Nissan or any agent or affiliate or disclose to Plaintiff the Spontaneous Fire Risk. Plaintiff is now concerned about driving it and charging it due to the dangers resulting from the Spontaneous Fire Risk Defect. In addition, Plaintiff has complied with Nissan's instructions not to use the Level 3 quick charging since October 2025. Plaintiff would not have purchased the vehicle, or would have paid less for it, had Plaintiff known about the Spontaneous Fire Risk or that her ability to use the Level 3 quick charging would be inhibited.

### B. Defendant

23. Defendant Nissan North America, Inc., d/b/a Nissan USA, is a motor vehicle manufacturer and a licensed distributor of new, previously untitled motor vehicles. It is headquartered at One Nissan Way, Franklin, Tennessee 37067.

24.     Nissan engages in commerce by distributing and selling new and used passenger cars and motor vehicles. Nissan, through its various entities, designs, manufactures, markets, distributes, and sells automobiles throughout the U.S. and worldwide. Nissan and/or its agents designed and manufactured the Class Vehicles. Nissan also developed and disseminated the owner's manuals and warranty booklets, advertisements, brochures, and other promotional materials relating to the Class Vehicles, with the intent that such documents be purposely distributed throughout all fifty states. Nissan is engaged in interstate commerce, selling vehicles through its network in every state of the United States.

## IV.     FACTUAL ALLEGATIONS

**A.     Nissan marketed the Nissan Leaf as a safe electric vehicle with quick charging capabilities.**

25.     The Nissan Leaf is an electric vehicle that that is powered by a rechargeable 60kWh or 40kWh lithium-ion battery. Unlike vehicles with conventional internal combustion engines, which can quickly refuel at a local gas station, the batteries on the Class Vehicles must either be charged at home or at special public charging stations. As a result, some of the most important considerations when purchasing an electric vehicle are the range and charging time of the batteries.[15]

26.     At the time the 2019 Nissan Leaf was marketed for sale, Nissan touted that since its launch in 2010, Nissan Leaf "has been the #1 mass production EV in the world."[16] A major marketing point Nissan made to consumers is the Nissan Leaf's range, which is 150 miles for the

---

[15] Exhibit 11, *Charging time most important for EV drivers*, EVBOOSTERS (July 24, 2022), https://evboosters.com/ev-charging-news/charging-time-most-important-for-ev-drivers/; Exhibit 12, *6 factors to consider before buying an EV in 2024*, PEAK (Apr. 10, 2024), https://www.owi.com/retail/brands/peak-auto/peak-news/factors-consider-before-buying-ev.
[16] Exhibit 13, *2019 Nissan LEAF Press Kit*, NISSAN (Feb. 21, 2019), https://usa.nissannews.com/en-US/releases/us-2019-nissan-leaf-plus.

40 kWh batteries and 226 miles for the 62 kWh batteries.[17] It stated, "The 2019 Nissan Leaf again sets the standard in the growing market for mainstream electric vehicles by offering customers great range, advanced technologies, and a dynamic design."[18]

27. The Nissan Leaf's quick charging port for Level 3 charging comes standard with certain trim packages and is also available as an upgrade option for more than $1,600.

28. The quick charge allows the vehicles to be charged to 80% in 40 minutes, while Level 1 charging takes approximately 35 hours and Level 2 charging takes approximately 7.5 hours.[19]

29. Indeed, safety, reliability, range, and charging ability were key features of Nissan's marketing campaign:[20]

---

[17] *Id.*; Exhibit 14, *2019 Nissan Leaf Brochure*, https://www.nissanusa.com/content/dam/Nissan/us/vehicle-brochures/2019/2019-nissan-nissan-leaf-brochure-en.pdf (last visited Oct. 8, 2025).

[18] *Id.*

[19] Exhibit 15, *2019 Nissan LEAF Specs*, https://usa.nissannews.com/releases/attachment/release-014945dbe939405f97533f414bc81c2d/4dac750b28893fad0a669c621c3d280f620f709a (last visited Oct. 8, 2025).

[20] Exhibit 16, *2019 Nissan LEAF safety and reliability*, Nissan, https://www1.nissanusa.com/vehicles/electric-cars/leaf/features/safety-features.html (last visited Oct. 8, 2025); Exhibit 17, *2019 Nissan LEAF range, charging & battery*, Nissan, https://www1.nissanusa.com/vehicles/electric-cars/leaf/features/range-charging-battery.html (last visited Oct. 8, 2025).

Vehicles   Shop   Electric   Owners   Dealers →   **Build & Price →**



| 2019 Nissan LEAF | Overview | **Features** | Gallery | Trims & Compare | Offers And Incentives | **Build & Price →** |

Electric Driving   Range & Charging   Driver Assistance   **Safety**   Connectivity

2019 Nissan LEAF safety and reliability
## Tech that's got your back, your sides and your front

NISSAN INTELLIGENT MOBILITY

**SEE AROUND YOUR LEAF**
LEAF's cameras and sensors keep a sharp watch and can help to keep you out of

**GET AWAY WITH JUST A WARNING**
LEAF's many safety technologies can alert you to trouble before it's too late.

**IT CAN REACT FOR YOU**
Should trouble catch you off your guard, LEAF's advanced safety features can react

Site Feedback

### Safety: standard on every LEAF

Every LEAF is built with certain advanced safety technologies that are looking out for you and yours by monitoring, responding and protecting to help keep you and your passengers safe. So, every time you drive your LEAF, safety and confidence are come along for the ride too.

### 6 Standard Air Bags

The Nissan Advanced Air Bag System includes dual-stage supplemental front air bags with seat belt and occupant-classification sensors. In addition, Nissan LEAF is equipped with front seat-mounted side-impact supplemental air bags, and roof-mounted curtain side-impact supplemental air bags with rollover sensor. [*]

### Brake smarter

Electronic Brake force Distribution (EBD) can detect extra weight in the back and adjusts the rear brakes accordingly. If you have to brake suddenly, the Nissan LEAF's Anti-Lock Braking System (ABS) can pump the brakes faster than you ever could.

### Anti-Lock Braking System

When you have to brake suddenly, the Nissan LEAF's ABS can pump the brakes faster than you ever could. This helps you maintain control by preventing wheel lockup, which in turn allows you to steer around obstacles in your path.

### Tire Pressure Monitoring System

The Nissan LEAF's Tire Pressure Monitoring System can let you know whenever a tire is low. And the Easy-Fill Tire Alert takes the guesswork out of filling your tires, with a beep of the horn to let you know when you've reached the correct pressure. [*][*]

### LATCH and Snug Kids®

The LATCH (Lower Anchors and Tethers for Children) system lets you secure compatible child restraints in the back seat without a seat belt or locking clip. Nissan's Snug Kids® is our Child Safety Seat Fit Program.

**More on Snug Kids →**

**Ready to Build?  →**



2019 Nissan LEAF range, charging & battery

# More range. More power.
# More LEAF.[*]

NISSAN INTELLIGENT MOBILITY

**GET WAY OUT THERE**
Go up to 226 miles on a single charge with LEAF's available 62 kWh battery [*]

**CHARGING WAS NEVER EASIER[*]**
Three different levels of charging means a plug-in is never out of reach.

**TALK TO YOUR LEAF**
Wherever you are, if you've got a compatible smartphone, you're connected with your LEAF. [*]

Nissan LEAF charging options & times

## Quicker, more convenient charging[*]

Getting your Nissan LEAF and you ready for your next adventure is as straightforward as plugging it in. The LEAF even lets you know when you are connected with a quick beep. With the onboard 6.6 kW onboard charger and the available Quick Charge Port there is more than one way to keep your LEAF at full charge.

 amazon | In-home charging solutions available through Amazon

| OPTION 1 | OPTION 2 | OPTION 3 |
|---|---|---|
| **240V - Home and public charging** | **480V - Public DC quick charging [*]** | **120V - Standard outlet** |







### Charge anywhere [*]

With 30,000 Level 2 public chargers in the U.S. and at home charging using a 240V outlet and the Portable Charging Cable finding the where to charge is as easy as the how to charge. And with Nissan's partnership with Amazon [*] a home charger and installation assistance is just clicks away. [*]

 **8 HOURS**
40 kWh BATTERY FULL CHARGE:
 UP TO 150 MILES [*] [*]

 **11.5 HOURS**
62 kWh BATTERY FULL CHARGE:
UP TO 226 MILES [*] [*]

### Charge in a flash [*]

The fastest way to charge. With tens of thousands of public DC Quick Charging stations across the country, you have an impressive number of locations to top off while on longer drives. [*][*]

 **40 MINUTES**
40 kWh BATTERY 80% CHARGE: [*]
50 kWh DC QUICK CHARGE

 **45 MINUTES**
62 kWh BATTERY 80% CHARGE: [*]
100 kWh DC QUICK CHARGE

 **60 MINUTES**
62 kWh BATTERY 80% CHARGE: [*]
50 kWh DC QUICK CHARGE

### Charge in a pinch

Need a charge in a pinch? The Nissan LEAF features a standard 120V charging cable, which allows you to temporarily plug into a standard 120V outlet for a Level 1 charge. It's the slowest option, but it lets you add some range almost anywhere you have access to electricity. [*]

30.     Had Plaintiffs and Class Members known that the Class Vehicles would not only be unsafe (because they can spontaneously catch fire) but that they would also be unable to use the quick charging functionality of the vehicles (per Nissan's instructions in connection with the Recalls), they either would not have purchased or leased their vehicles or would have paid substantially less for them.

**B.      The Spontaneous Fire Risk.**

31.     As Nissan has admitted in a September 19, 2024 Part 573 Safety Recall Report (which was later updated on November 14, 2024), and again in its October 1, 2025 Part 573 Safety Recall Report, "Nissan has determined the lithium-ion battery in affected vehicles may experience excessive lithium deposits within battery cells, increasing the electrical resistance and potentially causing a fluctuation in the state of charge."[21] "While the vehicle is Level 3 quick charging, the increased electrical resistance could result in rapid heating of the battery. If quick charging continues, a battery fire may occur increasing the risk of injury."[22]

32.     Nissan reported to NHTSA that:

Dealers were notified of the recall beginning September 20, 2024. On October 10, 2024, Nissan issued an Interim Owner Letter instructing customers not to use Level 3 quick charging until the remedy is completed. Nissan is developing a software reprogram to prevent progression to thermal incident. Due to an unexpected delay in the final remedy software development, owners will be mailed a second interim letter in late November 2024 updating them on the final remedy schedule. Nissan now expects the final remedy software to be available in Spring 2025.[23]

33.     The owner letters for the 2025 Recall have not yet been mailed to owners and lessees and there has been no estimate of when the remedy, if any, will be available.

---

[21] Ex. 5; Ex. 7; Ex. 9.
[22] *Id.*
[23] Ex. 7.

34.     As of the date of this filing, Nissan has not provided any remedy, let alone an adequate remedy, to address the Spontaneous Fire Risk Defect in any of the 2019-2022 Nissan Leaf vehicles subject to the 2024 Recall or the 2025 Recall.

35.     Nissan's reports to NHTSA come after an investigation into numerous Class Vehicle fires, the first of which occurred on September 5, 2023.[24] Over the next twelve months, and prior to announcing the 2024 Recall, Nissan learned of a total of nine vehicle fires.[25] Less than two weeks after announcing the 2024 Recall, Nissan learned of another vehicle fire involving a 2020 Leaf that used a Level 3 charger at a public charging station 2024.[26]

36.     It appears from Nissan's reporting to NHTSA that the root cause of the Defect is the buildup of excessive lithium deposits within battery cells during quick charging. Thus, a defect in design, manufacturing, and/or workmanship makes the Class Vehicle batteries unsuitable for safe quick charging.

37.     Aside from the mounting reports of Class Vehicles catching on fire while charging, Nissan knew or should have known about the Spontaneous Fire Risk Defect prior to sale or lease of the Class Vehicles. Lithium-ion batteries, like those in the Class Vehicles, carry well-documented risks of spontaneous combustion.[27] Safety concerns related to unexpected fires connected with lithium-ion batteries are well-documented and were known to Nissan at the time it designed, manufactured, and sold the Class Vehicles.[28] Well before 2018, when the 2019 Nissan

---

[24] Ex. 4.

[25] *Id.*

[26] *Id.*

[27] Exhibit 18, Adreesh Ghoshal, *How Lithium Ion Batteries in EVs Catch Fire*, MEDIUM (Aug. 17, 2020), https://medium.com/the-innovation/how-lithium-ion-batteries-in-evs-catch-fire-9d166c5b3af1.

[28] Exhibit 19, *Lithium-ion battery safety issues for electric and plug-in hybrid electric vehicles*, Report No. DOT HS 812 418, NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION (Oct. 2017), https://www.nhtsa.gov/sites/nhtsa.gov/files/documents/12848-

Leaf vehicles were first launched, many articles in the industry literature had discussed the thermal-runaway-related safety concerns of lithium-ion cells and battery packs and proposed solutions.

38.     Indeed, several years prior to the sale of the Class Vehicles, reports broke of spontaneous fires and explosions in cell phones using much smaller lithium-ion batteries.[29] This danger becomes even more catastrophic when it occurs in electric vehicles like the Class Vehicles, which have larger batteries and are designed to be charged while parked in garages, often in close proximity to flammable liquids and family residences.

39.     At a high level, the fire risk posed by the use of lithium-ion batteries stems from a phenomenon known as thermal runaway. A lithium-ion cell can heat up and catastrophically fail under one of several scenarios: a manufacturing defect in a cell, improper electrical charging and/or discharging, mechanical damage associated with significant bending or puncturing of a cell, and thermal abuse, wherein the cell is subjected to high temperatures. All of the scenarios generate local heating in the cell. The local heating induces locally high temperatures, which accelerate additional chemical reactions that can promote the degradation of the organic liquid electrolytes in the cell; these electrolytes and their decomposition products are volatile and flammable at high temperatures.[30]

_____

lithiumionsafetyhybrids_101217-v3-tag.pdf ("2017 NHTSA Report) at 2017 NHTSA Report at 2-24 through 2-27, 3-9-3 through 3-11 (discussing fire risks of high-voltage lithium-ion batteries in vehicles).

[29] *See, e.g.*, Exhibit 20, Erin Hawley, *Cell phone catches fire under teen's pillow*, KATV (July 28, 2014), https://katv.com/archive/cell-phone-catches-fire-under-teens-pillow; Exhibit 21, Andy Walker, *Smouldering smartphones: a brief history of mobile phone fires and how to avoid them*, GEARBURN (July 29, 2014), https://memeburn.com/gearburn/2014/07/smouldering-smartphones-a-brief-history-of-mobile-phone-fires-and-how-to-avoid-them/.

[30] Exhibit 22, Heekyon Yang, *Explainer: Are lithium-ion batteries in EVs a fire hazard?*, Reuters (Aug. 23, 2021), https://www.reuters.com/business/autos-transportation/are-lithium-ion-batteries-evs-fire-hazard-2021-08-23/#:~:text=

40. Significantly, the documented fires in the Class Vehicles do not appear to be the result of external abuse. And all have resulted from an internal failure while the cars are parked and charging. Given the risk of a single cell failure that may occur because of a cell defect, good engineering design should limit the thermal runaway propagation to adjacent cells. Catastrophic failure occurs when multiple cells become engaged in thermal runaway. It has been estimated that thermal runaway has caused as many as 80% of lithium-ion battery fires.[31]

41. These facts make it overwhelmingly likely that the Spontaneous Fire Risk is in fact the result of defectively designed, manufactured, and/or installed batteries.

**C. Nissan knew or should have known of the Spontaneous Fire Risk long before it disclosed the problem to Plaintiffs and Class Members.**

**1. Brief overview of lithium-ion batteries.**

42. Like other batteries, lithium-ion batteries are made up of multiple power-generating compartments called "cells."[32] Each cell contains the basic functional components of a simple battery: a positive electrode, a negative electrode, and an electrolyte.[33] In addition, each cell contains a separator designed to keep the positive electrode from contacting and discharging into the negative electrode.[34]

43. The active materials (either cathode or anode) store the lithium. The electrolyte carries the lithium ions between electrodes.[35] When lithium ions flow from the negative electrode,

---

Lithium%2Dion%20batteries%2C%20whether%20they,battery%20is%20not%20designed%20correctly.

[31] Ex. 18; Exhibit 23, Ryan Fogelman, *April 2020 Fire Report: How & Why Do Lithium-Ion Batteries Fail, Insight from the Jedi Master of Lithium Power!*, WASTE360 (May 5, 2020), https://www.waste360.com/safety/april-2020-fire-report-how-why-do-lithium-ion-batteries-fail-insight-jedi-master-lithium.

[32] Exhibit 24, Chris Woodford, *Lithium-ion batteries*, EXPLAINTHATSTUFF! (Nov. 23, 2020), https://www.explainthatstuff.com/how-lithium-ion-batteries-work.html.

[33] *Id.*

[34] *Id.*

[35] *Id.*

or anode, to the positive electrode, or cathode, energy is discharged from the battery cell in the form of electricity.[36] When the cell is charging, those ions flow in the opposite direction, or from cathode to anode.[37]

44.     Of course, a single cell cannot store nearly enough energy to power an automobile, so cells are grouped into modules and packs. Those modules and packs, together with control systems, constitute the complete battery.[38]

45.     A module ordinarily contains an array of cells, sensors, controls, protective safety devices, mounts, cooling elements or cooling provisions, and communications capabilities.[39]

46.     Beyond this, there are various methods of: (i) arranging the cells into arrays within the module; (ii) managing the flow of electrical current to and from the module or arrays within the module; and (iii) monitoring and managing the temperature of the cells within the module. Finally, there are various other necessary safety features, and integration with vehicle with the vehicle also plays an important role in the safety of the lithium-ion battery.[40]

47.     Just as important as the design and safety features used in a lithium-ion battery pack is rigorous pre-launch testing.[41]

48.     While it is impossible, prior to discovery, to know the precise methods that Nissan used or failed to use in the architecture and testing of the Li-ion batteries in the Class Vehicles, it is only too clear that Nissan launched the Nissan Leaf with catastrophically defective battery packs and/or related components of the battery system. The use of better safety systems and more

---

[36] *Id.*
[37] *Id.*
[38] Ex. 19, 2017 NHTSA Report, § 4.
[39] *Id.* § 4.1.1.
[40] *Id.*, Ch. 4.
[41] *Id.*, Ch. 8.

rigorous testing would have prevented the fires in certain owners' vehicles and the significant cost and inconvenience now visited upon all owners and lessees of the Class Vehicles.

49.     On information and belief, Nissan knew or should have known about the Spontaneous Fire Risk before it sold the Class Vehicles and certainly long before it disclosed the problem, as evidenced by: (1) the well-documented risks of runaway propagation in lithium-ion batteries; (2) the rigorous pre-launch testing Nissan must have done on the batteries; and (3) other similar fire issues in the electric vehicle industry.

**2.      Notwithstanding the great body of knowledge about the risks of spontaneous combustion in lithium-ion batteries, Nissan launched the Class Vehicles without either protecting against that risk or advising consumers of that risk.**

50.     A 2017 report published by NHTSA (the "2017 NHTSA Report")[42] on lithium-ion battery safety issues is particularly revealing because it documents the well-known fire risks, cites to the vast body of academic and engineering studies on those risks, and recommends rigorous design and testing protocols to protect against those risks. Nissan knew all of this at the time it launched the Class Vehicles.

51.     NHTSA reiterated that all car manufacturers had a duty "to conduct their own due diligence safety testing and analysis, while the industry is working to develop a consensus."[43] Unfortunately for Plaintiffs and Class Members, Nissan recklessly or intentionally breached this solemn duty so it could increase its profits.

---

[42] *Id.*
[43] *Id.* at xx.

52.     A central focus of the NHTSA Report is the fire risk associated with the use of lithium-ion batteries, and recommended protection methods and rigorous testing required to mitigate that risk.[44] The major cause of these fires is the propagation of thermal runaway.

53.     Simply put, thermal runaway "is a phenomenon in which the lithium-ion cell enters an uncontrollable, self-heating state."[45] If a cell short-circuits, the cell electrolyte can combust; pressure in the cell rapidly increases until the cell bursts and releases the flammable electrolyte and other flammable and toxic gases. It is known that rupturing cells release hydrogen gas, carbon monoxide gas, and various other flammable and toxic gases. The temperature of the ruptured cell can increase to above 1,832 degrees Fahrenheit.[46]

54.     As the 2017 NHTSA Report stresses:

> [T]hermal runaway of a Li-ion cell is one of the fundamental failure mechanisms leading to safety hazards from Li-ion batteries. Cell heating is normal, but temperatures must be maintained within a predetermined safe operating level. Thermal runaway is most likely to be realized when an event occurs that results in rapid heating of the cell that outpaces the rate of heat dissipation by the cell. Rapid heating may be caused by internal or external short circuits, overcharging, and general use [among other things]….[47]

As the Report further notes, "[t]he thermal and mechanical design of a cell strongly influences its ability to control and dissipate heat, thereby influencing its safety performance."[48]

---

[44] *See id.* at xvi; *see also id.* at Ch. 6 (management and control systems), 8-10 (testing, "gap assessments," and "hazards, risks and risk mitigation strategies").

[45] Exhibit 25, *What is Thermal Runaway?*, UNDERWRITERS LABORATORIES (Aug. 24, 2021), https://ul.org/research-updates/what-is-thermal-runaway/.

[46] Exhibit 26, Alysha Liebscher and Gary Gayman, *Preventing Thermal Runaway in Electric Vehicle Batteries*, MACHINE DESIGN (Dec. 26, 2018), https://www.machine design.com/materials/article/21837402/preventing-thermal-runaway-in-electric-vehicle-batteries at 3.

[47] Ex. 19, 2017 NHTSA Report at 3.2.

[48] *Id.*

55.     When thermal runaway spreads from one cell to adjacent cells in the module, the result is what appears to be happening in the Class Vehicles—thermal runaway propagation (or runaway propagation), causing spontaneous combustion even when the cars are parked. In other words, "the rapid and extreme rise in temperature (thermal runaway) can easily propagate to nearby cells in a domino effect that has been dubbed thermal runaway propagation."[49] Fires and explosions then result.

56.     Given the extreme hazards of runaway propagation in high-voltage lithium-ion batteries such as those used in the Class Vehicles, it is incumbent upon manufacturers to incorporate strong safety measures and rigorous testing.

57.     As the 2017 NHTSA report noted in a statement that has been sadly prophetic for Plaintiffs and all other owners and lessees of the Class Vehicles, as of 2017 car manufacturers were not adequately designing and testing electric and plug-in-hybrid electric systems powered by highly volatile lithium-ion batteries—indeed, the "safety standards" employed by car manufactures such as Nissan appeared "to trail—rather than lead—technology development."[50]

58.     As of 2017, there were a good number of standards and testing protocols designed to guide manufacturers in constructing lithium-ion battery systems to be safely used in electric and plug-in hybrid electric vehicles, and many safety technologies and testing protocols existed at the time of the launch of the Class Vehicles.[51]

59.     Appropriate safety measures to prevent thermal runaway at the cellular level included a range of "electrical components and subsystems to prevent heating and overpressure to

---

[49] Ex. 26 at 3.
[50] Ex. 19, 2017 NHTSA Report at 1-3.
[51] *See id.* at 3-9 through 3-11, Ch. 8.

the cell by opening the circuit, increasing resistance, or changing the chemical composition of the cell."[52]

60. Protection technology at the module level also existed, including technologies for "charge and discharge management," designed to limit the electric current to and from the battery module or cellular arrays within a module. Such technologies also protect against the potential for abnormal discharge caused by failures such as short circuiting, which can trigger thermal runaway and ultimately runaway propagation.[53]

61. Also at the module level, manufacturers must ensure adequate thermal management to monitor and prevent the spikes in temperature associated with thermal runaway. "Thermal management functions at the module level include, first monitoring, then cooling," and various available technologies serve this function.[54] Thermal management must also occur at the battery pack level in order to maintain "an average temperature within the battery's specifications, and with even temperature distribution throughout the pack."[55] Cooling and thermal barrier separation between cells can reduce the rate of thermal runaway propagation and can stop cell-to-cell propagation for properly sized cells and cooling systems.

62. Other available safety features at the module level included "interlock circuits, pressure sensors, and communication architecture that allows the battery status to be monitored by the automobile electronic control unit."[56]

---

[52] Id. at 3-10.
[53] Id. at 4-6.
[54] Id. at 4-10 through 4-15.
[55] Id. at 4-24.
[56] Id. at 4-16 through 4-19.

63. Other available safety measures operate at the battery pack level, including (but not limited to) thermal management (discussed above), an array of communication, control and reporting functions,[57] and the appropriate integration of the battery pack with the vehicle.[58]

64. On information and belief, any number of combinations of the above-referenced safety protocols, in combination with effective safety testing, would have rendered the Class Vehicles safe and fit for their intended purpose of operating as electric vehicles.

65. On information and belief, Nissan skimped on available protection measures in order to tout the quick charging capabilities and battery range of the Class Vehicles—all to the benefit of Nissan's bottom line and to the detriment of owners and lessees of the Class Vehicles.

66. Regardless of the safety measures incorporated in the battery and related components designed to prevent runaway propagation, before launching an electric vehicle, propagation testing is of the utmost importance.[59]

67. Once again, at the time of the launch of the Class Vehicles, there were a wide array of standards and safety testing of lithium-ion batteries and vehicles that use them, including those promulgated by the Society for Automotive Engineers (SAE), the International Organization for Standardization, Underwriters Laboratories, the Institute for Electrical and Electronics Engineers, the United Nations Economic Commission for Europe, and Sandia National Laboratories for the FreedomCAR program.[60]

68. Many of these standards and testing protocols protect against runaway propagation and the resulting catastrophe for vehicle owners and anyone or anything in their vicinity.[61]

---

[57] *Id.* at 4-28.
[58] *Id.* at 4-34.
[59] *Id.* at 3-9 (discussing propagation testing *circa* 2014).
[60] *Id.* at 8-1.
[61] *See id.* at Ch. 8.

69.     These standards and testing protocols provided Nissan with a wide range of guidelines on design and laboratory testing considerations to ensure the safety of lithium-ion batteries in the Class Vehicles.

70.     On information and belief, any adequate testing of the Class Vehicles would have revealed the lithium-ion batteries' propensity to spontaneously combust as the result of runaway propagation. Either Nissan followed these standards and testing protocols and discovered the risk, or it failed to follow these protocols.

### 3.     Nissan launches the Class Vehicles, and fires result.

71.     No later than Fall 2023, Nissan Leaf owners and lessees complained that their Class Vehicles suddenly caught fire. Nissan has reported the following to NHTSA:[62]

6.  Chronology of Principal Events:

On September 5, 2023, a thermal incident involving a MY20 Nissan LEAF vehicle occurred during Level 3 quick charging. Nissan inspected the incident vehicle and initially determined that the thermal event appeared to originate from inside the battery pack. Nissan immediately launched an investigation into the issue together with the battery supplier.

September 2023 through October 2023 – Review of available charging data determined there were no signs of charging equipment concern. Further investigation determined the thermal event was the result of a loose fastener inside the battery pack following a battery repair completed on September 1, 2023. Nissan judged this thermal event as an isolated incident due to improper battery repair.

November 2023 through January 2024 – On November 7, 2023, Nissan received a report of a thermal incident on a MY20 Nissan LEAF while the vehicle was quick charging. Nissan and the supplier investigated the incident vehicle's battery and observed evidence of an electrical short and identified a potential weld concern. Duplication testing was inconclusive, and Nissan continued the investigation.

February 2024 through May 2024 - A thermal incident was reported on February 12, 2024 for a MY20 Nissan LEAF during quick charging. As Nissan was continuing its investigation, on April 22nd the Nissan investigation team became aware of a report of a thermal incident involving MY19 Nissan LEAF vehicle while quick charging, and on April 30th, Nissan received a report of a MY20 Nissan LEAF vehicle that experienced a thermal incident during quick charging. Nissan inspected the incident vehicles and collected the battery packs for supplier analysis. Additionally, Nissan initiated a 4M investigation into the supplier's battery assembly process.

---

[62] Ex. 4.

June 2024 through July 2024 – The supplier conducted extensive analysis of the battery packs collected from the incident LEAF vehicles to determine the cause of incidents. The investigation also identified records of state-of-charge fluctuations prior to certain thermal events. One of the incident parts exhibited excessive lithium deposits within specific cells inside the battery pack. Nissan received reports of two additional thermal events while charging: on July 12th for a MY20 Nissan LEAF and on July 19th for a MY19 Nissan LEAF. Nissan also launched a warranty parts collection activity for MY20 Nissan LEAF batteries to further inform its investigation.

August 2024 through September 2024 – On August 13th and 14th, Nissan received two additional reports of thermal incidents involving MY20 Nissan LEAF vehicles which occurred while Level 3 quick charging. Nissan conducted third-party battery testing on an incident battery pack, which recorded observations of excessive lithium deposits within the battery cells. Subsequent battery cell disassembly from certain Model Year 2019 and 2020 battery packs received from the warranty parts collection also identified excessive lithium deposits were present.

Available charging data for the field incident vehicles gave no indication of any charging equipment issues. Nissan preliminarily determined excessive lithium deposits within lithium-ion battery cells may increase the electrical resistance and potentially cause a fluctuation in the state of charge.

Additionally, it was determined that Level 3 quick charging has a higher charging rate of up to 50 kW for 40 kWh battery and up to 100 kW for 62 kWh battery; which can generate a high amount of heat in the battery cells. This rapid heating of the battery may increase to a level potentially reaching maximum battery temperature. However, Level 1 and Level 2 normal charging (via a separate charge port), will not increase battery temperature during charging due to the much lower maximum charge rate of 3.3 kW and 6.6 kW, respectively for Level 1 and Level 2.

On September 3rd, Nissan received a report of a thermal incident involving a MY19 LEAF vehicle which occurred while Level 3 quick charging.

September 12, 2024 – Based on the preliminary investigation results and out of abundance of caution, Nissan decided to conduct a Voluntary Safety Recall for MY19-20 Nissan LEAF vehicles equipped with a quick charge port. At the time of the decision, Nissan had confirmed a total of nine (9) U.S. market incidents related to the subject condition as detailed above.

On September 30, 2024, Nissan received a report that a MY20 LEAF experienced a thermal incident while using a Level 3 public charging station. Nissan's investigation into this incident and the issue is on-going at this time.

November 2024 – Nissan became aware of a clerical error that may have occurred during the validation of the affected recall population. On November 7, Nissan corrected the error which resulted in 1,817 additional Nissan LEAF vehicles being added to the total affected population.

Nissan is not aware of any injuries related to the subject condition.

72. Additionally, all vehicle manufacturers, including Nissan, routinely monitor and analyze NHTSA complaints to determine whether vehicles or components should be recalled due to safety concerns. Thus, on information and belief, Nissan has knowledge of all NHTSA complaints filed concerning the vehicles it manufactures, including the Class Vehicles. *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

73. For example, a complaint submitted to Nissan and to NHTSA detail the circumstances of a Class Vehicle fire and the potential safety risks of the incident:

**NHTSA ID Number:** 11608237
**Incident Date:** July 19, 2024
**Consumer Location:** ALPHARETTA, GA
**Vehicle Identification Number:** 1N4AZ1CP0KC******
**Summary of Complaint**
**Crash:NoFire:YesInjuries:2Deaths:0**
On 7/19/2024 while charging the car at Chargepoint Johns Creek, I heard a "clunk" sound as if something had popped off from beneath the body of the Leaf. At the same time, the charging emergency stopped. Smoke started to come out from under the Leaf. There was a smell as if something was melting, making me feel dizzy and nauseous. I felt a sense of confusion from inhaling the smoke. Since both my son and I were outside the car, we were able to quickly pull away and escape as soon as the smoke started. If we had been inside the car, or if this had happened while driving, we might have been unable to escape in time, lost consciousness from the smoke, and possibly died in the fire. The smoke continued for about 15 minutes, followed by a fire. At the same time, there was a sound of something exploding. The police arrived, followed by the fire truck. It took a long time to extinguish the fire, possibly because the lithium battery caught fire. Please refer to the video. Mental and Physical Condition After the Accident Both my son and I are experiencing symptoms similar to PTSD. When we smell smoke or drive a car, we feel chills, nausea, and dizziness, which negatively affect our daily lives. This incident left burn scur to my son and has started having nightmares and crying at night. Seeing an electric vehicle scares us to the point that our bodies freeze and we can't move. Also, seeing fire or hearing car sounds suddenly makes us tremble, our hearts race, and we have difficulty breathing. We start crying uncontrollably in a panic, and it takes time to calm down. It is difficult to control our emotions. We are experiencing insomnia, likely due to the excitement of our nerves from the accident. We probably need mental treatment such as therapy and physical treatment to alleviate insomnia and tension.

**D. The Recalls have failed to provide a remedy and restrict the normal and expected use of the Class Vehicles.**

74. Despite Nissan's knowledge of the serious risk of spontaneous fire in the Class Vehicles, it has done nothing to remedy the problem. In short, the Recalls have failed to remedy the Defect.

75. Despite Nissan's knowledge of the Defect and issuance of the 2024 Recall in October 2024, Nissan failed to warn owners and lessees of 2021-2022 Nissan Leaf vehicles with the same batteries that their batteries were defective and prone to fire. As a result, there have been multiple complaints made to NHTSA by consumers that their 2021 Nissan Leaf experienced a vehicle fire:

> **NHTSA ID Number:** 11689478
> **Incident Date:** September 21, 2025
> **Consumer Location:** NORWALK, CA
> **Vehicle Identification Number:** 1N4BZ1DV2MC******
> **Summary of Complaint**
> **Crash:NoFire:YesInjuries:0Deaths:0**
> Took car to dealership to charge. Got home and an hour later the battery ignited into a fire. Car was engulfed with smoke ,fire in front of our house. After 4 hours with fire dept trying to put out the fire within battery... it still continued to smoke. Hazmat team came out as well. Total loss after having car less than 30 days that I purchased as dealership.

> **NHTSA ID Number:** 11684419
> **Incident Date:** August 30, 2025
> **Consumer Location:** Unknown
> **Vehicle Identification Number:** 1N4BZ1DV7MC******
> **Summary of Complaint**
> **Crash:NoFire:YesInjuries:0Deaths:0**
> The contact owns a 2021 Nissan Leaf. The vehicle was taken to a charging station, and while driving at 5 MPH, entering the driveway, the battery burst into flames. There were no warning lights illuminated. The contact stated that the failure was similar to NHTSA Campaign Number: 24V700000 (Electrical System). The police department was on the scene. The fire department attempted to extinguish the fire, but the battery continued to ignite. The fire marshal from Minnesota was contacted for assistance to resolve the matter, and the fire department had taken the battery to a gravel pit. The local dealer was not contacted. The vehicle was not diagnosed or repaired. The manufacturer was not notified of the failure. The approximate failure mileage was 60,000.

26

76.     As for the Class Vehicles included in the 2024 Recall, Plaintiffs and Class Members have been instructed not to use Level 3 quick charging since October 2024, which has reduced their ability to charge the vehicle to 80% in less than an hour. Instead, they have been confined to only Level 2 charging, which takes 8-11.5 hours to fully charge the vehicle.

77.     Complaints made by Class Members to NHTSA detail the frustration and inconvenience the charging limitation has caused them. A *sampling* of these complaints is listed below:

> **NHTSA ID Number:** 11628875
> **Incident Date:** December 4, 2024
> **Consumer Location:** MIAMI, FL
> **Vehicle Identification Number:** 1N4AZ1CP3KC******
> **Summary of Complaint**
> **Crash:NoFire:NoInjuries:0Deaths:0**
> I BOUGHT THIS VEHICLE IN JUNE OF 2023 A 2019 NISSAN LEAF FROM HGREG NISSAN I RIECIEVED NOTIFICATION OF SOME RECALLS ONE WAS FIXED THE OTHER 2 WILL BE FIXED SOON. THE LATEST ONE IS THE BATTERY THAT IS DRAINING VERY FAST, AND IT IS NOW A RECALL WITH NO SOLUTION, UNABLE TO USE A FAST CHARGER AS THE CAR MAY CATCH ON FIRE, I SPEND AN AVERAGE OF 7 HOURS CHARGING THE CAR IN A REGULAR CHARGER WEEKLY. I FEEL THAT I AM PAYING FOR A DEFECTIVE PRODUCT AND THE SOLUTION KEEPS ON GETTING DELAYED. I AM CONSIDERING HIRING AN ATTORNEY TO TRY TO FIND A SUITABLE SOLUTION FOR THIS SITUATION THAT IT IS AFFECTING MY DAILY LIVING AS THE MILES I AM GETTING ON A FULL CHARGE IS ABOUT 130 MILES AND THERE ARE NOT ENOUGH CHARGERS AROUND GIVING ME TREMENDOUS ANXIETY AND STRESS. I DO NOT HAVE THE MEANS TO EVEN TRADE IN THIS CAR AS I AM VERY UPSIDE DOWN OR EVEN SELL IT AS I AM GETTING A 3RD OF WHAT I OWE SINCE NO ONE WANTS TO BUY THIS CAR NOW.

> **NHTSA ID Number:** 11630753
> **Incident Date:** November 1, 2024
> **Consumer Location:** CUMMING, GA
> **Vehicle Identification Number:** 1N4AZ1CP9KC******
> **Summary of Complaint**
> **Crash:NoFire:NoInjuries:0Deaths:0**
> This vehicle has recall with fast charging component. When we purchased this pre-owned car, the remedy date for this recall was given as November 2024. Hence we purchased this vehicle even though there was a recall. Now the remedy

27

date on the website shows as March 2025. Because of which we are not able to use this vehicle to go office where we could have charged the vehicle using fast-EV charger in office parking. It is inconvenient for us.

**NHTSA ID Number:** 11659093
**Incident Date:** May 5, 2025
**Consumer Location:** SAINT PAUL, MN
**Vehicle Identification Number:** 1N4BZ1CPXKC******
**Summary of Complaint**
**Crash:NoFire:NoInjuries:0Deaths:0**
Reporting that, in September 2024, Nissan publicly suggested March 2025 would be the estimated timeline for recall service resolution. Now in May 2025, I'm still unable to use the Level 3 charging due to recall 24V-700. Until September 2024, we could safely use this feature for longer term trips, and we are still waiting for Nissan to resolve this recall so we can resume trips.

**NHTSA ID Number:** 11658842
**Incident Date:** September 1, 2024
**Consumer Location:** PALO ALTO, CA
**Vehicle Identification Number:** 1N4BZ1CPXKC******
**Summary of Complaint**
**Crash:NoFire:NoInjuries:0Deaths:0**
Because of the uncorrected recall issue, I have been unable to use the quick charge on my vehicle for 8 months. This has been an great inconvenience and will cause me to **have to rent a car for the summer if the problem is not corrected.** Remedy has missed the promised fix date by two months already. From the recall notice WHILE AN AFFECTED VEHICLE IS LEVEL 3 QUICK CHARGING, THE INCREASED ELECTRICAL RESISTANCE COULD RESULT IN RAPID HEATING OF THE BATTERY. IF QUICK CHARGING CONTINUES, A BATTERY FIRE MAY OCCUR INCREASING THE RISK OF INJURY. CUSTOMERS ARE INSTRUCTED NOT TO USE LEVEL 3 QUICK CHARGING VIA THE CHADEMO CONNECTOR UNTIL THE REMEDY IS COMPLETED

**NHTSA ID Number:** 11659922
**Incident Date:** September 19, 2024
**Consumer Location:** FLOYD, VA
**Vehicle Identification Number:** 1N4AZ1CP3KC******
**Summary of Complaint**
**Crash:NoFire:NoInjuries:0Deaths:0**
I received a recall notice from Nissan on 9/19/24. It stated: "Until your vehicle is remedied, do NOT use the level 3 quick charge port (CHAdeMO). ....... If quick charging continues, a battery fire may occur, increasing the risk of injury." I was told by your office that Nissan "expects" to have a remedy by this summer. That's nearly a year of very limited use of my Nissan Leaf, never mind the

significant reduction in its resale value. It is a very very poor standard of responsibility by Nissan.

**NHTSA ID Number:** 11690044
**Incident Date:** September 22, 2024
**Consumer Location:** LOUISVILLE, CO
**Vehicle Identification Number:** 1N4AZ1CP8KC******
**Summary of Complaint**
**Crash:NoFire:NoInjuries:0Deaths:0**
R24B2 Battery recall has been going on for a full year now with remedies being moved every time the date has been reached. Nissan refuses a buyback, but still has no solution to the no fast charging mandate. The car would NOT have been purchased if I had known there is essentially no level 3 charging on this car.

**NHTSA ID Number:** 11689695
**Incident Date:** September 25, 2025
**Consumer Location:** LA PLACE, LA
**Vehicle Identification Number:** 1N4BZ1CP4KC******
**Summary of Complaint**
**Crash:NoFire:NoInjuries:0Deaths:0**
I have been waiting an entire year for Nissan to resolve the battery issue. I have purchased another house 240 miles away and I need to charge my leaf at least once to move it to my new home. If I fast charge the car it may catch fire and if it does this without the recall being resolved my insurance won't pay for the loss since Nissan has warned the car can not be fast charged. Waiting an entire year is not reasonable. Please force Nissan to resolve the recall by either a software update or battery replacement.

**NHTSA ID Number:** 11689615
**Incident Date:** September 25, 2025
**Consumer Location:** TALLAHASSEE, FL
**Vehicle Identification Number:** 1N4BZ1CP1LC******
**Summary of Complaint**
**Crash:NoFire:NoInjuries:0Deaths:0**
I am unable to travel long distances in my 2020 Nissan Leaf due to the pending recall, which states that rapid charging may cause a fire in the car due to overheating of the primary lithium battery. Fast charging is the only workable charging method for traveling long distances in the Nissan Leaf. This failure to correct the problem has rendered my Nissan Leaf useless and valueless.

**NHTSA ID Number:** 11689337
**Incident Date:** September 24, 2025
**Consumer Location:** CAMAS, WA
**Vehicle Identification Number:** 1N4BZ1CP5LC******
**Summary of Complaint**
**Crash:NoFire:NoInjuries:0Deaths:0**

There is a safety recall for the traction battery that is over a year old. I cannot use the car as intended because fast charging is not available. I am constantly worried about the battery catching fire as I hear more reports of this happening. Nissan has not reached out to me about this recall and there is no indication of when a fix will be available. Nissan is not taking this recall seriously and needs to settle it ASAP! It has now been a year since the recall was announced. I am entering my travel season for work again and cannot use my car.

**NHTSA ID Number:** 11689367
**Incident Date:** September 24, 2024
**Consumer Location:** Unknown
**Vehicle Identification Number:** 1N4BZ1DP9LC******
**Summary of Complaint**
**Crash:NoFire:NoInjuries:0Deaths:0**
We have an open recall for the DC fast Charging for the last year. I use my car for work and often need to fast charge and haven't been able to and so have to use another vehicle. This has caused a lot of stress and problems for work over the last year and Nissan have failed to address. I am also then concerned about resale value for the vehicle

**NHTSA ID Number:** 11689495
**Incident Date:** September 17, 2024
**Consumer Location:** FAIRFAX, VA
**Vehicle Identification Number:** 1N4BZ1DP0LC******
**Summary of Complaint**
**Crash:NoFire:NoInjuries:0Deaths:0**
The car was recalled over a year ago, and a remedy was promised in a few months. The issue has still not been resolved, resulting in the inability to take the car on a trip longer than about 175 miles. This completely compromises the usability of the vehicle!

**NHTSA ID Number:** 11689079
**Incident Date:** September 23, 2024
**Consumer Location:** CARBONDALE, CO
**Vehicle Identification Number:** 1N4AZ1CP5LC******
**Summary of Complaint**
**Crash:NoFire:NoInjuries:0Deaths:0**
It has been a YEAR with no ability to quick charge my car. This is ridiculous, they need to put in a new battery and be done with this. It renders the car useless for many trips! Why aren't you doing anything about this

**NHTSA ID Number:** 11688854
**Incident Date:** April 16, 2024
**Consumer Location:** Unknown
**Vehicle Identification Number:** 1N4AZ1BP3LC******
**Summary of Complaint**

**Crash:NoFire:NoInjuries:0Deaths:0**

This car has been under recall at risk of fire, injury, and death, and Nissan has made no attempts to fix the recall for years now. Im not able to use a feature I paid for and I'm worried if someone else uses the vehicle without knowing will start a fire

**NHTSA ID Number:** 11688364
**Incident Date:** September 19, 2024
**Consumer Location:** DURHAM, NC
**Vehicle Identification Number:** 1N4BZ1DPXLC******
**Summary of Complaint**
**Crash:NoFire:NoInjuries:0Deaths:0**

I am submitting this complaint due to Nissan's lack of action on a critical safety recall that has remained open without a remedy for over a year (NHTSA Recall Number 24V-700 / Nissan Recall Number R24B2). The recall involves a manufacturing defect in the high-voltage battery that can cause overheating and fire during DC fast charging. This is a severe safety risk, not only to owners but also to nearby vehicles and property at charging stations. Nissan's only response has been to tell owners not to use DC fast charging, which was inadequate as a temporary measure and unacceptable as a long-term solution. Without access to DC fast charging, vehicle usability is severely compromised. Daily commuting is difficult, and long-distance travel is nearly impossible. Level 1 and 2 charging do not provide practical alternatives, and many owners rely on DC fast charging as their only feasible option. This feature is a basic expectation of modern EV ownership, and had I known I would lose it indefinitely, I would never have purchased this vehicle. After a full year, Nissan has provided no remedy, no timeline, and no meaningful communication. Even if a fix were announced today, implementation would take additional weeks or months. This is not a timely response to a major safety and usability issue. As an affected owner, I expect one of the following: (1) Nissan issues and implements a permanent fix within 30 days, (2) provides a free loaner vehicle until a remedy is available, or (3) repurchases the defective vehicles from me and other affected owners. Continuing with no action is unacceptable. As a repeat Nissan customer, this experience has been deeply disappointing and has caused me to lose confidence in the brand.

**NHTSA ID Number:** 11686336
**Incident Date:** September 10, 2025
**Consumer Location:** OAKHURST, CA
**Vehicle Identification Number:** 1N4BZ1CP0LC******
**Summary of Complaint**
**Crash:NoFire:NoInjuries:0Deaths:0**

Note: Searching for similar complaints I found them under "Engine", "Electrical", and "Fuel". There are many such complaints! My 2020 Nissan Leaf has been under a recall notice since September of 2024 (12 months ago). Nissan warned the battery may catch fire during level 3 (rapid) charging. Nissan ordered owners not to use rapid chargers until a fix was in place. Such a fix was (and still

is) promised by March 2025. That date is 6 months past now and yet their website still proclaims it. This, to me, demonstrates that Nissan is not actively working on the problem. They seem content to have shifted the burden of dealing with the problem onto their customers. Rapid charging is not a luxury, especially with large capacity batteries. Fully charging the car in 2-3 hours instead of 10-12 hours is a key selling point of the vehicle. To remove it amounts to a bait and switch. One year is an extremely generous amount time to allow for a solution. Obviously, they want a software solition to avoid the high cost of replacing the batteries. Obviously, they can't find a software solution. It is time for them to be forced to accept the higher cost consequence of releasing a faulty product. P.S. During a phone conversation with Nissan customer service in late July, I was told (after many denials that anything was wrong with them proclaiming a fix in March 2025 in July 2025) that a fix would be available in November. As their site still says March 2025 I must assume that was a blatant lie to pacify me.

78.     As shown by Plaintiffs' experiences and the experiences of those Class Members who submitted complaints to NHTSA, the inability to use the Level 3 quick charging has significantly affected their use of their vehicles and inhibited the normal use of the vehicles. For example, they cannot take trips they otherwise would have taken, daily driving becomes more difficult, they have to pay for a rental car if they need to take an extended trip, and the value of the vehicle has diminished, all with the worry that the Class Vehicles contain defective batteries that could catch fire. Had Plaintiffs and Class Members known of the Spontaneous Fire Risk Defect, they either would not have purchased or leased these vehicles or would have paid less for them. And the inability to use the Level 3 quick charging has led to a loss of expected use of the Class Vehicles.

## V.     TOLLING OF THE STATUTE OF LIMITATIONS

**A.     Discovery Rule Tolling**

79.     Because Nissan concealed the existence of the Spontaneous Fire Risk, Plaintiffs and Class Members had no way of knowing about the unreasonable fire risk of the Class Vehicles until Nissan informed them of the Defect through the 2024 Recall and the 2025 Recall.

80. Within the period of any applicable statutes of limitation, Plaintiffs and members of the proposed Class and Subclasses could not have discovered through the exercise of reasonable diligence that Nissan was concealing the conduct complained of herein.

81. Plaintiffs and the other Class Members did not discover, and did not know of, facts that would have caused a reasonable person to suspect that Nissan did not report information within its knowledge to federal and state authorities, its dealerships, or consumers; nor would a reasonable and diligent investigation have disclosed that Nissan had concealed information about the unreasonable fire risk of the Class Vehicles, which was discovered by Plaintiffs only shortly before this action was filed.

82. For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to the Class Vehicles.

**B. Fraudulent Concealment Tolling**

83. All applicable statutes of limitation have also been tolled by Nissan's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the period relevant to this action.

**C. Estoppel**

84. Nissan was under a continuous duty to disclose to Plaintiffs and the other Class Members the true character, quality, and nature of the fire risk of the Class Vehicles.

85. Nissan knowingly, affirmatively, and actively concealed or recklessly disregarded the true nature, quality, and character of the fire risk of the Class Vehicles.

86. Based on the foregoing, Nissan is estopped from relying on any statutes of limitations in defense of this action.

# VI.    CLASS ALLEGATIONS

87.    Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class and subclasses:

> **Nationwide Class**: All persons or entities who purchased or leased one or more model year 2019-2022 Nissan Leaf vehicle with a quick charging port (the "Class Vehicles").
>
> **Florida Subclass**: All persons or entities who purchased or leased one or more of the Class Vehicles in the State of Florida.
>
> **Michigan Subclass**: All persons or entities who purchased or leased one or more of the Class Vehicles in the State of Michigan.

88.    Plaintiffs assert claims under the laws of each state set forth below.

89.    Excluded from the definitions of each Class and Subclass are any personal injury or property damages claims resulting from the fires or explosions caused by the Class Vehicles. Also excluded from the Class and Subclasses are Nissan and its subsidiaries and affiliates; all persons who make a timely election to be excluded from this action; governmental entities; the Judge to whom this case is assigned and his/her immediate family; and Plaintiffs' Counsel. Plaintiffs reserve the right to revise the Class and Subclass definitions based upon information learned through discovery.

90.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

91.    This action has been brought and may be properly maintained on behalf of the Classes and Subclasses proposed herein under Federal Rule of Civil Procedure 23.

92.    **Numerosity**. Federal Rule of Civil Procedure 23(a)(1): The members of each Class and Subclass are so numerous and geographically dispersed that individual joinder of all Class

members is impracticable. For purposes of this complaint, Plaintiffs allege that there are estimated

to be more than 40,000 Class Vehicles in the Nationwide Class. The precise number of Class and

Subclass members is unknown to Plaintiffs but may be ascertained from Nissan's books and

records. Class and Subclass members may be notified of the pendency of this action by recognized,

Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail,

Internet postings, and/or published notice.

93.     **Commonality and Predominance**: Federal Rule of Civil Procedure 23(a)(2) and

23(b)(3): This action involves common questions of law and fact, which predominate over any

questions affecting individual Class and Subclass members, including, without limitation:

     a.    Whether Nissan engaged in the conduct alleged herein;

     b.    Whether the Spontaneous Fire Risk Defect creates an unreasonable risk of fires in the Class Vehicles;

     c.    When Nissan first knew or should have known about the Spontaneous Fire Risk Defect;

     d.    Whether Nissan designed, manufactured, marketed, and distributed the Class Vehicles with defective high-voltage battery packs;

     e.    Whether Nissan's conduct renders it liable for breach of the implied warranty of merchantability;

     f.    Whether Nissan's conduct renders it liable for breach of its express warranties;

     g.    Whether Nissan has been unjustly enriched at the expense of Plaintiffs and the Class and Subclasses;

     h.    Whether Plaintiffs and the other Class and Subclass members lost the use of their vehicles' quick charging functionality;

     i.    Whether Plaintiffs and the other Class and Subclass members overpaid for their vehicles at the point of sale; and

     j.    Whether Plaintiffs and the other Class and Subclass members are entitled to damages and other monetary relief and, if so, in what amount.

94. **Typicality**: Federal Rule of Civil Procedure 23(a)(3): Plaintiffs' claims are typical of the other Class and Subclass members' claims because, among other things, all Class and Subclass members were comparably injured through Nissan's wrongful conduct as described above.

95. **Adequacy**: Federal Rule of Civil Procedure 23(a)(4): Plaintiffs are adequate Class and Subclass representatives because their interests do not conflict with the interests of the other members of the Class and Subclasses they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The Class and Subclasses' interests will be fairly and adequately protected by Plaintiffs and their counsel.

96. **Superiority**: Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class and Subclass members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Nissan, so it would be impracticable for the members of the Class and Subclasses to individually seek redress for Nissan's wrongful conduct. Even if Class and Subclass members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

# VII. CLAIMS

## A. Nationwide Claims

### COUNT I

### VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
### (15 U.S.C. § 2301, *et seq.*)
### (Alleged by all Plaintiffs on behalf of the Nationwide Class
### or, in the alternative, the State Subclasses)

97. Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

98. Plaintiffs bring this claim on behalf of the Nationwide Class.

99. This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332(a)-(d).

100. The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). Plaintiffs and Nationwide Class members are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its implied warranties.

101. Nissan is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

102. 15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.

103. Nissan provided Plaintiffs and Class Members with an implied warranty of merchantability in connection with the purchase or lease of their vehicles that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). As a part of the implied warranty of merchantability, Nissan warranted that the Class Vehicles engines were fit for their ordinary purpose as safe electric motor vehicles and would pass without objection

in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

104.    Nissan breached its implied warranties, as described in more detail above, and is therefore liable to Plaintiffs pursuant to 15 U.S.C. § 2310(d)(1). Without limitation, the Class Vehicles share a common defect in that they are all equipped with a electric battery propulsion system that makes the vehicles susceptible to a risk of spontaneous combustion, causing an unreasonable risk of death, serious bodily harm and/or property damage to lessees and owners of the Class Vehicles as well as their homes, passengers, and bystanders. This defect rendered the Class Vehicles, when sold/leased and at all times thereafter, unmerchantable and unfit for their ordinary use. In fact, as a result of the defect, Nissan specifically advised owners and lessees not to use Level 3 quick charging for their vehicles.

105.    As discussed above, on information and belief, Nissan skimped on available safety technologies that would have precluded the Spontaneous Fire Risk, and, through the sort of testing that any responsible vehicle manufacturer would have done prior to launching the Class Vehicles, Nissan knew or should have known of the defect. Yet, in order to pad its bottom line, Nissan intentionally or recklessly foisted the unreasonably dangerous Class Vehicles on unwitting class members.

106.    Any effort by Nissan to limit the implied warranties in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim or otherwise limit such liability is null and void.

107.    Any limitations Nissan might seek to impose on its warranties are procedurally unconscionable. There was unequal bargaining power between Nissan and Plaintiffs, as, at the

time of purchase and lease, Plaintiffs had no other options for purchasing warranty coverage other than directly from Nissan.

108.    Any limitations Nissan might seek to impose on its warranties are substantively unconscionable. Nissan knew that the Class Vehicles were defective and that the Class Vehicles could spontaneously ignite when used as intended long before Plaintiffs and the Class. Nissan failed to disclose this defect to Plaintiffs and the Class. Thus, enforcement of the durational limitations on the warranties is harsh and would shock the conscience.

109.    Plaintiffs have had sufficient direct dealings with either Nissan to establish privity of contract between Nissan and Plaintiffs. Nonetheless, privity is not required here because Plaintiffs are intended third-party beneficiaries of contracts between Nissan and its dealers, and specifically, of Nissan's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit consumers. Finally, privity is also not required because the Class Vehicles are dangerous instrumentalities due to the aforementioned defect, as spontaneous fires present an unreasonable risk of death, serious bodily harm and/or property damage to lessees and owners of the Class Vehicles as well as their homes, other nearby structures and vehicles, passengers and bystanders.

110.    Pursuant to 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action and are not required to give Nissan notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiffs pursuant to Rule 23 of the Federal Rules of Civil Procedure.

111.    Plaintiffs would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them. Because Nissan will not acknowledge

any revocation of acceptance and immediately return any payments made, Plaintiffs have not re-accepted their Class Vehicles by retaining them.

112.    The amount-in-controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit. Plaintiffs, individually and on behalf of all other Nationwide Class members, seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial. In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs and the Nationwide Class members in connection with the commencement and prosecution of this action.

113.    Plaintiffs also seek the establishment of a Nissan-funded program for Plaintiffs and Nationwide Class members to recover out-of-pocket costs incurred in attempting to rectify and/or mitigate the effects of the Spontaneous Fire Risk Defect in their Class Vehicles.

**B.    State-Specific Claims**

**1.    Florida**

**COUNT II**

**VIOLATIONS OF THE FLORIDA UNFAIR &
DECEPTIVE TRADE PRACTICES ACT
(Fla. Stat. § 501.201, *et seq.*)
(Alleged by Plaintiff Azar on behalf of the Florida Subclass)**

114.    Plaintiff Azar ("Plaintiff," for the purposes of this claim) and the Florida Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

115.    Plaintiff brings this claim individually and behalf of members of the Florida Subclass ("Class Members," for the purposes of this claim).

116.    Plaintiff and Class Members are "consumers" within the meaning of the Florida Unfair and Deceptive Trade Practices Act ("FUDTPA"), Fla. Stat. § 501.203(7).

117.    Nissan engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

118.    The FUDTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce .…" Fla. Stat. § 501.204(1). By concealing the Spontaneous Fire Risk in the Class Vehicles, Nissan participated in unfair and deceptive trade practices that violated the FUDTPA as described herein.

119.    Nissan's actions, as set forth above, occurred in the conduct of trade or commerce.

120.    In the course of its business, Nissan concealed the Spontaneous Fire Risk in the Class Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Nissan also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

121.    By failing to disclose and by actively concealing the Spontaneous Fire Risk in the Class Vehicles, which it marketed as safe, reliable, of high quality, and fit for use as electric vehicles, Nissan engaged in unfair and deceptive business practices in violation of the FUDTPA.

122.    In the course of Nissan's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defect in the Class Vehicles.

123.    Nissan's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and Class Members, about the true safety and reliability of their vehicles.

124. Nissan intentionally and knowingly misrepresented material facts regarding the Class Vehicles with the intent to mislead Plaintiff and Class Members.

125. Nissan knew or should have known that its conduct violated the FUDTPA.

126. As alleged above, Nissan made material statements about the safety and reliability of the Class Vehicles that were either false or misleading.

127. Nissan owed Plaintiff and Class Members a duty to disclose the true safety and reliability of the Class Vehicles because Nissan:

      a.      Possessed exclusive knowledge about the Spontaneous Fire Risk;

      b.      Intentionally concealed the foregoing from Plaintiff and Class Members;

      c.      Made incomplete representations about the safety and reliability of the Class Vehicles, and their ability to utilize Level 3 quick charging, while purposefully withholding material facts from Plaintiff and Class Members that contradicted these representations; and/or

      d.      Had duties under the TREAD Act and related regulations to disclose and remedy the defect.

128. Because Nissan fraudulently concealed the Spontaneous Fire Risk, as well as the true nature of the Class Vehicles, Plaintiff and Class Members were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Had Plaintiff and Class Members been aware of the defects in their vehicles, they would have either not have bought or leased their Class Vehicles or would have paid less for them.

129. Nissan's concealment of the Spontaneous Fire Risk, and the Class Vehicles' inability to safely use Level 3 quick charging, in the Class Vehicles was material to Plaintiff and Class Members.

130. Plaintiff and Class Members suffered ascertainable loss caused by Nissan's misrepresentations and its concealment of and failure to disclose the Spontaneous Fire Risk. Plaintiff and Class Members either would have paid less for their vehicles or would not have purchased or leased them at all.

131. Nissan's violations present a continuing risk to Plaintiff and Class Members as well as to the general public. In particular, and as alleged herein, Nissan has yet to offer any fix for the Class Vehicles. Nissan's unlawful acts and practices complained of herein affect the public interest.

132. As a direct and proximate result of Nissan's violations of the FUDTPA, Plaintiff and Class Members have suffered injury-in-fact and/or actual damage as alleged above.

133. Plaintiff and Class Members are entitled to recover their actual damages under Fla. Stat. § 501.211(2) and attorneys' fees under Fla. Stat. § 501.2105(1).

134. Plaintiff and Class Members also seek an order enjoining Nissan's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the FUDTPA.

### COUNT III

**BREACH OF IMPLIED WARRANTY OF**
**MERCHANTABILITY UNDER FLORIDA LAW**
**(Fla. Stat. § 672.314)**
**(Alleged by Plaintiff Azar on behalf of the Florida Subclass)**

135. Plaintiff Azar ("Plaintiff," for the purposes of this claim) and the Florida Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

136. Plaintiff brings this claim individually and behalf of members of the Florida Subclass ("Class Members," for the purposes of this claim).

137. Nissan is a "merchant" within the meaning of Fla. Stat. § 672.104, and a "seller" of motor vehicles within the meaning of Fla. Stat. § 672.103(d).

138. Under Florida law, an implied warranty of merchantability attaches to the Class Vehicles. Fla. Stat. § 672.314.

139. The Class Vehicles were not merchantable when sold or leased because their electric propulsion systems are prone to spontaneous combustion and pose an unreasonable risk of fires due to the Spontaneous Fire Risk as described herein. Without limitation, the Class Vehicles share a common defect in that they are all equipped with an electric battery propulsion system that makes the vehicles susceptible to a risk of spontaneous combustion, causing an unreasonable risk of death, serious bodily harm and/or property damage to lessees and owners of the Class Vehicles as well as their homes, passengers and bystanders.

140. Because of the defect, Nissan specifically advises owners and lessees not to charge their batteries using Level 3 quick charging. Accordingly, the vehicles are not merchantable and fit for their ordinary use because, by depriving the vehicles of the ability to safely use a Level 3 charger, the vehicles' functionality and reasonably expected usefulness are severely limited, causing economic harm to the owners.

141. Plaintiff and Class Members have had sufficient direct dealings with Nissan to establish privity of contract between Nissan, on the one hand, and Plaintiff and Class Members, on the other hand. Nonetheless, privity is not required here because Plaintiff and Class Members were and are third-party beneficiaries of Nissan's contracts with Nissan-certified/authorized retailers who sold or leased the Class Vehicles to Plaintiff and Florida Subclass members. *See* Fla. Stat. § 672.318. The dealers were not intended to be the ultimate users of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty

agreements were designed for and intended to benefit purchasers and lessees of the Class Vehicles only.

142.     As a direct and proximate result of Nissan's breach of the implied warranty of merchantability, Plaintiff and Florida Class Members have been damaged in an amount to be determined at trial.

## COUNT IV

### BREACH OF EXPRESS WARRANTY UNDER FLORIDA LAW
(Fla. Stat. § 672.313, 680.21 and 680.1031)
(Alleged by Plaintiff Azar on behalf of the Florida Subclass)

143.     Plaintiff Azar ("Plaintiff," for the purposes of this claim) and the Florida Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

144.     Plaintiff brings this claim individually and behalf of members of the Florida Subclass ("Class Members," for the purposes of this claim).

145.     Plaintiff and Class Members have defective vehicles and, despite Nissan's knowledge of the defect, have been unable to receive a remedy.

146.     Nissan is and was at all relevant times a "merchant" with respect to motor vehicles under FLA. STAT. §§ 672.104(1) and 680.1031(3)(k), and a "seller" of motor vehicles under § 672.103(1)(d).

147.     With respect to leases, Nissan is and was at all relevant times a "lessor" of motor vehicles under FLA. STAT. § 680.1031(1)(p).

148.     The Class Vehicles are and were at all relevant times "goods" within the meaning of FLA. STAT. §§ 672.105(1) and 680.1031(1)(h).

149.     Nissan provided Plaintiff and Class Members with one or more express warranties in connection with the purchase or lease of Class Vehicles, including: (1) a 3-year/36,000-mile Basic Limited Warranty; (2) a 5-year/60,000-mile EV System Coverage Limited Warranty; and

(3) an 8-year/100,000-mile Lithium-ion Battery Coverage Limited Warranty. Under the warranties provided to Plaintiff and Class Members, Nissan promised to repair or replace covered defective components, at no cost to owners and lessees of the Class Vehicles. As alleged herein, Nissan breached these warranties.

150.    Nissan marketed the Class Vehicles as high quality, reliable, and safe vehicles, and that Nissan would stand behind the quality of its products and promptly repair any defects. These statements helped conceal the existence of the Spontaneous Fire Risk and its corresponding safety risk from Plaintiff and Class Members.

151.    Plaintiff and Class Members have had sufficient direct dealings with Nissan to establish privity of contract between Nissan, on the one hand, and Plaintiff and Class Members, on the other hand. Nonetheless, privity is not required here because Plaintiff and Class Members are intended third-party beneficiaries of contracts between Nissan and its dealers, and specifically, of their express warranties. The dealers were not intended to be the ultimate users of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit purchasers and lessees of the Class Vehicles only.

152.    Nissan's warranties formed a basis of the bargain that was reached when Plaintiff and Class Members purchased or leased their Class Vehicles.

153.    Despite knowing of the Spontaneous Fire Risk since, at the latest, September 2023, Nissan has not repaired or replaced the defective battery free of charge for Plaintiff and Class Members pursuant to the warranties. Nissan admitted the existence of the Spontaneous Fire Risk more than a year ago but has failed to remedy it. This is not a "reasonable" amount of time to prepare and provide a remedy.

154. Nissan was provided notice by Plaintiff of Nissan's breach of express warranties by the filing of the initial complaint in this action and the presuit notice letters that Plaintiff's counsel sent. Despite this notice, Nissan did not cure its breach of express warranties and failed to provide a suitable repair or replacement of the defective battery free of charge within a reasonable time.

155. Alternatively, Plaintiff and Class Members were excused from providing Nissan with notice and an opportunity to cure the breach of warranty because it would have been futile. Nissan did not have a repair available when it announced the recall for the Spontaneous Fire Risk Defect, and it still has not provided any recall remedy to address the defect. As a result, Plaintiff and Class Members had no reason to believe that Nissan would have repaired the Spontaneous Fire Risk Defect if they presented their Class Vehicles to Nissan for repair.

156. Because of the Spontaneous Fire Risk, the Class Vehicles are not reliable and owners of these vehicles have lost confidence in their ability to perform the function of safe reliable transportation and charging.

157. As a direct and proximate result of Nissan's breach of express warranties, Plaintiff and Class Members have been damaged in an amount to be determined at trial.

158. In the alternative, should Nissan claim that the Spontaneous Fire Risk is covered under the warranties, the warranties now fail in their essential purpose because the contractual remedy is insufficient to make Plaintiff and Class Members whole because Nissan has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

159. Finally, because of Nissan's breach of express warranty as set forth herein, Plaintiff and Class Members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff and Class Members of the purchase or lease price of all

Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

## COUNT V

### UNJUST ENRICHMENT
### (COMMON LAW)
### (Alleged by Plaintiff Azar on behalf of the Florida Subclass)

160.    Plaintiff Azar ("Plaintiff," for the purposes of this claim) and the Florida Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

161.    Plaintiff brings this claim individually and behalf of members of the Florida Subclass ("Class Members," for the purposes of this claim).

162.    This claim is pleaded in the alternative to the contract-based claims brought on behalf of Plaintiff and Class Members.

163.    Nissan has received and retained a benefit from Plaintiff and Class Members and inequity has resulted.

164.    Nissan has benefitted from selling, leasing, and distributing the Class Vehicles for more than they were worth as a result of Nissan's conduct, and Plaintiff and Class Members have overpaid for the Class Vehicles and been forced to pay other costs. Moreover, despite retaining a benefit at the cost of Class Members, because of the conduct of Defendant, Class Members have been deprived of the ordinary and expected use of their vehicles.

165.    Plaintiff and Class Members conferred a benefit on Nissan.

166.    It is inequitable for Nissan to retain these benefits.

167.    Plaintiff and Class Members were not aware of the true facts about the Class Vehicles and were harmed by Nissan's conduct.

168.    Nissan knowingly accepted the benefits of its unjust conduct.

169.    As a result of Nissan's conduct, the amount of its unjust enrichment should be determined in an amount according to proof.

   **2.    Michigan**

## COUNT VI

### VIOLATIONS OF THE MICHIGAN CONSUMER PROTECTION ACT
### (Mich. Comp. Laws § 445.903, *et seq.*)
### (Alleged by Plaintiff Williams on behalf of the Michigan Subclass)

170.    Plaintiff Williams ("Plaintiff," for the purposes of this claim) and the Michigan Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

171.    Plaintiff brings this claim individually and on behalf of the members of the Michigan Subclass ("Class Members," for the purposes of this claim).

172.    Plaintiff and Class Members are "consumers" within the meaning of the Michigan Consumer Protection Act ("MCPA"), Mich. Compl. Laws § 445.902.

173.    Nissan engaged in "trade or commerce" within the meaning of the MCPA. *Id.*

174.    The MCPA prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce . . ." Mich. Comp. Laws § 445.903(1). By concealing the Spontaneous Fire Risk in the Class Vehicles, Nissan participated in unfair and deceptive trade practices that violated the MCPA as described herein.

175.    Nissan's actions, as set forth above, occurred in the conduct of trade or commerce.

176.    In the course of its business, Nissan concealed the Spontaneous Fire Risk in the Class Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Nissan also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

177. By failing to disclose and by actively concealing the Spontaneous Fire Risk in the Class Vehicles, which it marketed as safe, reliable, of high quality, and fit for use as electric vehicles, Nissan engaged in unfair and deceptive business practices in violation of the MCPA.

178. In the course of Nissan's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defect in the Class Vehicles.

179. Nissan's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and Class Members, about the true safety and reliability of their vehicles.

180. Nissan intentionally and knowingly misrepresented material facts regarding the Class Vehicles with the intent to mislead Plaintiff and Class Members.

181. Nissan knew or should have known that its conduct violated the MCPA.

182. As alleged above, Nissan made material statements about the safety and reliability of the Class Vehicles that were either false or misleading.

183. Nissan owed Plaintiff and Class Members a duty to disclose the true safety and reliability of the Class Vehicles because Nissan:

    a.    Possessed exclusive knowledge about the Spontaneous Fire Risk;

    b.    Intentionally concealed the foregoing from Plaintiff and Class Members;

    c.    Made incomplete representations about the safety and reliability of the Class Vehicles, and their ability to utilize Level 3 quick charging, while purposefully withholding material facts from Plaintiff and Class Members that contradicted these representations; and/or

    d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defect.

184. Because Nissan fraudulently concealed the Spontaneous Fire Risk, as well as the true nature of the Class Vehicles, Plaintiff and Class Members were deprived of the benefit of their

bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Had Plaintiff and Class Members been aware of the defects in their vehicles, they would have either not have bought or leased their Class Vehicles or would have paid less for them.

185. Nissan's concealment of the Spontaneous Fire Risk, and the Class Vehicles' inability to safely use Level 3 quick charging, in the Class Vehicles was material to Plaintiff and Class Members.

186. Plaintiff and Class Members suffered ascertainable loss caused by Nissan's misrepresentations and its concealment of and failure to disclose the Spontaneous Fire Risk. Plaintiff and Class Members either would have paid less for their vehicles or would not have purchased or leased them at all.

187. Nissan's violations present a continuing risk to Plaintiff and Class Members as well as to the general public. In particular, and as alleged herein, Nissan has yet to offer any fix for the Class Vehicles. Nissan's unlawful acts and practices complained of herein affect the public interest.

188. As a direct and proximate result of Nissan's violations of the MCPA, Plaintiff and Class Members have suffered injury-in-fact and/or actual damage as alleged above.

189. Plaintiff and Class Members are entitled to recover their actual damages and attorney's fees under the MCPA.

190. Plaintiff and Class Members also seek an order enjoining Nissan's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the MCPA.

## COUNT VII

## BREACH OF IMPLIED WARRANTY OF
## MERCHANTABILITY UNDER MICHIGAN LAW
### (Mich. Comp. Laws § 440.2314)
### (Alleged by Plaintiff Williams on behalf of the Michigan Subclass)

191. Plaintiff Williams ("Plaintiff," for the purposes of this claim) and the Michigan Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

192. Plaintiff brings this claim individually and on behalf of the members of the Michigan Subclass ("Class Members," for the purposes of this claim).

193. Nissan is a "merchant" within the meaning of Mich. Comp. Laws § 440.2314(1).

194. Under Michigan law, an implied warranty of merchantability attaches to the Class Vehicles. Mich. Comp. Laws § 440.2314.

195. The Class Vehicles were not merchantable when sold or leased because their electric propulsion systems are prone to spontaneous combustion and pose an unreasonable risk of fires due to the Spontaneous Fire Risk as described herein. Without limitation, the Class Vehicles share a common defect in that they are all equipped with an electric battery propulsion system that makes the vehicles susceptible to a risk of spontaneous combustion, causing an unreasonable risk of death, serious bodily harm and/or property damage to lessees and owners of the Class Vehicles as well as their homes, passengers and bystanders.

196. Because of the defect, Nissan specifically advises owners and lessees not to charge their batteries using Level 3 quick charging. Accordingly, the vehicles are not merchantable and fit for their ordinary use because, by depriving the vehicles of the ability to safely use a Level 3 charger, the vehicles' functionality and reasonably expected usefulness are severely limited, causing economic harm to the owners.

197. Plaintiff and Class Members have had sufficient direct dealings with Nissan to establish privity of contract between Nissan, on the one hand, and Plaintiff and Class Members, on the other hand. Nonetheless, privity is not required here because Plaintiff and Class Members were and are third-party beneficiaries of Nissan's contracts with Nissan-certified/authorized retailers who sold or leased the Class Vehicles to Plaintiff and Michigan Subclass members. The dealers were not intended to be the ultimate users of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit purchasers and lessees of the Class Vehicles only.

198. As a direct and proximate result of Nissan's breach of the implied warranty of merchantability, Plaintiff and Michigan Class Members have been damaged in an amount to be determined at trial.

## COUNT VIII

### BREACH OF EXPRESS WARRANTY UNDER MICHIGAN LAW
(Mich. Comp. Laws §§ 440.2313 and 440.2860)
(Alleged by Plaintiff Williams on behalf of the Michigan Subclass)

199. Plaintiff Williams ("Plaintiff," for the purposes of this claim) and the Michigan Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

200. Plaintiff brings this claim individually and on behalf of the members of the Michigan Subclass ("Class Members," for the purposes of this claim).

201. Plaintiff Class Members have defective vehicles and, despite Nissan's knowledge of the defect, have been unable to receive a remedy.

202. Nissan is and was at all relevant times a "merchant" with respect to motor vehicles under Mich. Comp. Laws Ann. § 440.2104(1) and a "seller" of motor vehicles under § 440.2313(1).

203.    With respect to leases, Nissan is and was at all relevant times a "lessor" of motor vehicles under Mich. Comp. Laws Ann. §§ 440.2803(1)(p), and 440.2860.

204.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Mich. Comp. Laws Ann. §§ 440.2105(1) and 440.2803(1)(h).

205.    Nissan provided Plaintiff and Class Members with one or more express warranties in connection with the purchase or lease of Class Vehicles, including: (1) a 3-year/36,000-mile Basic Limited Warranty; (2) a 5-year/60,000-mile EV System Coverage Limited Warranty; and (3) an 8-year/100,000-mile Lithium-ion Battery Coverage Limited Warranty. Under the warranties provided to Plaintiff and Class Members, Nissan promised to repair or replace covered defective components, at no cost to owners and lessees of the Class Vehicles. As alleged herein, Nissan breached these warranties.

206.    Nissan marketed the Class Vehicles as high quality, reliable, and safe vehicles, and that Nissan would stand behind the quality of its products and promptly repair any defects. These statements helped conceal the existence of the Spontaneous Fire Risk and its corresponding safety risk from Plaintiff and Class Members.

207.    Plaintiff and Class Members have had sufficient direct dealings with Nissan to establish privity of contract between Nissan, on the one hand, and Plaintiff and Class Members, on the other hand. Nonetheless, privity is not required here because Plaintiff and each of the other members of the Classes are intended third-party beneficiaries of contracts between Nissan and its dealers, and specifically, of their express warranties. The dealers were not intended to be the ultimate users of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit purchasers and lessees of the Class Vehicles only.

208.     Nissan's warranties formed a basis of the bargain that was reached when Plaintiff and Class Members purchased or leased their Class Vehicles.

209.     Despite knowing of the Spontaneous Fire Risk since, at the latest, September 2023, Nissan has not repaired or replaced the defective battery free of charge for Plaintiff and Class Members pursuant to the warranties. Nissan admitted the existence of the Spontaneous Fire Risk more than a year ago but has failed to remedy it. This is not a "reasonable" amount of time to prepare and provide a remedy.

210.     Nissan was provided notice by Plaintiff of Nissan's breach of express warranties by the filing of the initial complaint in this action and the presuit notice that Plaintiff's counsel sent. Despite this notice, Nissan did not cure its breach of express warranties and failed to provide a suitable repair or replacement of the defective battery free of charge within a reasonable time.

211.     Alternatively, Plaintiff and Class Members were excused from providing Nissan with notice and an opportunity to cure the breach of warranty because it would have been futile. Nissan did not have a repair available when it announced the recall for the Spontaneous Fire Risk Defect, and it still has not provided any recall remedy to address the defect. As a result, Plaintiff and Class Members had no reason to believe that Nissan would have repaired the Spontaneous Fire Risk Defect if they presented their Class Vehicles to Nissan for repair.

212.     Because of the Spontaneous Fire Risk, the Class Vehicles are not reliable and owners of these vehicles have lost confidence in their ability to perform the function of safe reliable transportation and charging.

213.     As a direct and proximate result of Nissan's breach of express warranties, Plaintiff and Class Members have been damaged in an amount to be determined at trial.

214. In the alternative, should Nissan claim that the Spontaneous Fire Risk is covered under the warranties, the warranties now fail in their essential purpose because the contractual remedy is insufficient to make Plaintiff and Class Members whole because Nissan has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

215. Finally, because of Nissan's breach of express warranty as set forth herein, Plaintiff and Class Members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff and Class Members of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

## COUNT IX

### UNJUST ENRICHMENT
### (COMMON LAW)
### (Alleged by Plaintiff Williams on behalf of the Michigan Subclass)

216. Plaintiff Williams ("Plaintiff," for the purposes of this claim) and the Michigan Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

217. Plaintiff brings this claim individually and on behalf of the members of the Michigan Subclass ("Class Members," for the purposes of this claim).

218. This claim is pleaded in the alternative to the contract-based claims brought on behalf of Plaintiff and Class Members.

219. Nissan has received and retained a benefit from Plaintiff and Class Members and inequity has resulted.

220. Nissan has benefitted from selling, leasing, and distributing the Class Vehicles for more than they were worth as a result of Nissan's conduct, and Plaintiff and Class Members have overpaid for the Class Vehicles and been forced to pay other costs. Moreover, despite retaining a

benefit at the cost of Class Members, because of the conduct of Defendant, Class Members have been deprived of the ordinary and expected use of their vehicles.

221.    Plaintiff and Class Members conferred a benefit on Nissan.

222.    It is inequitable for Nissan to retain these benefits.

223.    Plaintiff and Class Members were not aware of the true facts about the Class Vehicles and were harmed by Nissan's conduct.

224.    Nissan knowingly accepted the benefits of its unjust conduct.

225.    As a result of Nissan's conduct, the amount of its unjust enrichment should be determined in an amount according to proof.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Class and Subclasses, respectfully request that the Court enter judgment in their favor and against Nissan, as follows:

A.    Certification of the proposed Nationwide and State Subclasses, including appointment of Plaintiffs' counsel as Class Counsel;

B.    Restitution, including at the election of Class and Subclass members, recovery of the purchase price of their Class Vehicles, or the overpayment for their vehicles;

C.    Damages, including punitive damages, costs, and disgorgement in an amount to be determined at trial, including for overpayment and the economic harm resulting from the deprivation of the ordinary and expected use of Class Vehicles;

D.    Non-monetary/injunctive relief, including an order requiring defendant to provide timely providing an adequate remedy for the subject defect;

E.    An order requiring Nissan to pay both pre- and post-judgment interest on any amounts awarded;

57

F.       An award of costs and attorneys' fees; and

G.       Such other or further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

DATED: October 10, 2025            Respectfully submitted,

*/s/ Mark P. Chalos*
Mark P. Chalos (BPR # 19328)
**LIEFF CABRASER HEIMANN &**
**BERNSTEIN, LLP**
222 2nd Avenue South, Suite 1640
Nashville, TN 37201
Telephone: (615) 313-9000
mchalos@lchb.com

Phong-Chau G. Nguyen (CA Bar No. 286789)*
**LIEFF CABRASER HEIMANN &**
**BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, California 94111-3339
Telephone: (415) 956-1000
pgnguyen@lchb.com

E. Powell Miller (MI Bar No. P39487)*
Dennis A. Lienhardt (MI Bar No. P81118)*
Dana E. Fraser (MI Bar No. P82873)*
**THE MILLER LAW FIRM PC**
950 W. University Drive, Suite 300
Rochester, MI 48307
Telephone: (248) 841-2200
epm@millerlawpc.com
dal@millerlawpc.com
def@millerlawpc.com

*Counsel for Plaintiffs and the Proposed Classes*

**pro hac vice* application to be filed